DANIEL A. CROLEY (154386)
FUTTERMAN & DUPREE LLP
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
dan@dfdlaw.com

*Attorneys for Plaintiff*
*Geller International, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GELLER INTERNATIONAL, INC. | Case No. C 07-05159 MMC |
| Plaintiff, | |
| v. | **DECLARATION OF JAMES GELLER IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| HITOSHI NISHIKAWA and ASIA INTERNATIONAL, INC. | |
| Defendants. | |

I, James Geller, declare:

1.     I am the President and founder of Geller International, Inc. ("GI"). Based on my role with GI, I have personal knowledge of the facts set forth below and, if called as a witness, could testify competently to them.

2.     I have been in the food service industry for more than 20 years. From many years of selling food products to restaurants, I have developed expertise in what professional chefs and others want when purchasing meat, seafood, and other food products. I understand the requirements and preferences of the customers and have worked hard to develop a business that provides premium, professional service to my customers.

3.      I started GI in 2000, which now consists of only two employees, including myself. GI is engaged in the business of importing and exporting specialty meat, seafood and other high-end, gourmet food products.  GI works as an intermediary between suppliers and purchasers (such as restaurants and other wholesalers) in the U.S. and throughout Asia for specialty foods such as Wagyu beef ("Kobe");  Harris Ranch beef; specialty processed meats (sausages, etc.); fresh and frozen oysters, scallops and other seafood products; produce and other types of gourmet, perishable food items.  From among its suppliers, GI locates and qualifies the best possible import distribution company in a given market for its clients.  Over the years, GI has developed numerous business relationships with companies in Japan, mainland China, Taiwan, Korea, Hong Kong, Thailand, Singapore, Malaysia, Indonesia and the Philippines.  GI also handles full container loads of US frozen and perishable products for export worldwide.  GI has contacts with various transport companies that can ship large quantities of frozen or refrigerated food items throughout the world.

4.      GI has spent considerable resources developing confidential and trade secret information about its customers and suppliers throughout the world.  On the purchaser side, GI's confidential information includes things such as each customer's contact information (e.g., the name and email address of the chef at a particular restaurant), buying habits and preferences, and order history.  On the supplier side, GI's confidential information includes the supplier's name, contact information, products available, pricing, transaction habits and preferences.  GI has assembled this information over a period of years, primarily through my personal efforts to develop business relationships with customers and suppliers throughout the U.S. and Asia.  This information, which is used to generate sales, is not generally known in the marketplace.  GI takes reasonable measures to assure such information is not misused, including contractual restrictions on disclosure or use of its confidential business information.  The detailed information necessary to achieve the sales GI has achieved is not contained in any public lists, but was compiled by me over years and could not be duplicated without years of time and effort and considerable expense. It would take at least four to twelve months just to create a duplicate of GI's customer and

FUTTERMAN &
DUPREE LLP

1 supplier lists, without including all the specific information such as buying and selling habits,

2 preferences and order history.

3    5.    In about April 2003, GI engaged Defendant Hitoshi Nishikawa as a commissioned

4 sales agent. Nishikawa agreed to enter into an "Employment Agreement" as an express

5 condition of his relationship with Plaintiff. A true and correct copy of Nishikawa's fully-

6 executed Employment Agreement is attached hereto as Exhibit A. Among other things the

7 Employment Agreement restricts Nishikawa's activities during the relationship (Paragraph 6,

8 "Contractor's Loyalty to Employer's Interests") and during and after the relationship (Paragraph

9 7, "Nondisclosure of Information Concerning Business").

10    6.    While working with GI, Nishikawa had access to and became familiar with GI's

11 confidential and trade secret business information about its suppliers and customers, as described

12 above.

13    7.    GI issued Defendant a laptop computer, to be used during his relationship with GI,

14 in connection with Defendant's business. That computer contained confidential and trade secret

15 information concerning GI's business including information about the identities, contact

16 information, sales information, contract specifications and sales terms for supplier and buyers.

17 For example, the laptop computer contained very detailed files on customers and suppliers.

18 These files included information such as the names of the customers for the Wagyu beef

19 program, chefs' names and email addresses, and physical addresses of restaurants. In addition,

20 the laptop contained over two years' of detailed sales reports by customer. The sales reports

21 contain information such as particular cuts of beef the customer has purchased; the weight of

22 each cut; GI's buying price and selling prices; freight preferences (e.g., how the products are

23 wrapped or packaged and whether they are refrigerated or frozen), delivery schedules and other

24 customer preferences; and buy and selling prices for various suppliers. Plaintiff did not store or

25 backup the hard drive from the laptop onto Plaintiff's computers in the office and consequently I

26 believe the data stored on this laptop computer is not saved or accessible by me.

27    8.    Nishikawa's business relationship with GI terminated on about until September 5,

28 2007.

FUTTERMAN &
DUPREE LLP

1      9.     Nishikawa refused to return the laptop when he left GI, despite my and my

2 attorney's demands.  On September 10, 2007, my then attorney Paul Derenthal sent Nishikawa a

3 letter demanding return of the laptop.  Attached as Exhibit B is a true and correct copy of

4 Derenthal's letter.

5      10.     Since leaving GI, Nishikawa has set up a food import-export business that

6 competes directly with GI.

7      11.     I have reason to believe that Nishikawa is using GI's confidential business

8 information to compete with GI.  For example,

9      a.  I learned that Nishikawa, on or about September 4 or 5, 2007, placed an order

10      for scallops with Northern Wind Seafood, one of GI's suppliers located in

11      Massachusetts.  Mike Fernandez, my contact at Northern Wind, advised me

12      that Northern Wind had received an order from Nishikawa for scallops.

13      According to Mr. Fernandez, Nishikawa placed an order with Northern Wind

14      to purchase scallops using GI's account; the next day, Nishikawa called

15      Northern Wind and asked it to change to order to his personal name.  Mr.

16      Fernandez called me to advise me of this unusual order.  Nishikawa would not

17      have known about Northern Wind, the products they carry, their pricing or

18      other specifics necessary to place this order without using GI's confidential

19      information.  This was the first sale for scallops in two years, and Nishikawa

20      purposely kept the order off GI's books knowing he was going to leave and

21      take this order with him.  GI lost approximately $4,000 to $6,000 by losing

22      this single order for scallops. About a week before Nishikawa left GI, I heard

23      him calling to Northern Wind about ordering scallops. I believe Nisikawa

24      stole this opportunity for his new business based on what Mike Fernandez

25      reported about this order and since this would have been GI's first order for

26      scallops in about two years.

27      b.  I learned that Nishikawa recently attempted to place an order with Mohawk

28      Packing Company. ("Mohawk"), a long time supplier of GI  and, in particular,

FUTTERMAN &
DUPREE LLP

1    in respect to a long-time relationship GI has with a Japanese distributor which

2    typically has made monthly orders with GI for about four years. My contact at

3    Mohawk, Joe Rosa, reported to me that Nisikawa on or about September 27,

4    2007 attempted to complete GI's regular order GI had been placing with this

5    same Japanese customer of GI. GI has also not received an order from this

6    Japanese customer in September, 2007. Attached hereto as Exhibit C is a true

7    and correct copy of an email I received from Joe Rosa concerning Nishikawa

8    attempting to obtain this order.

9        12.    I learned that Nishikawa recently returned from a food show that a Hawaiian

10   Island meat distribution company, had held there in the week of September 10, 2007. I was the

11   person who established the contact with this Hawaiian Island distributor and gave the lead to

12   Nishikawa to develop on behalf of GI. When Nishikawa's employment from GI terminated, I

13   told him not to attend this food show, but he said. I'm going on my dime, and I'm going there to

14   represent myself as a Wagyu seller." This is a clear instance of Nishikawa using GI's business,

15   my work, and GI's data to steal opportunities.

16       13.    I believe Nishikawa will continue to use GI's confidential information to compete

17   with GI in the specialty food market. I have learned that Nishikawa has contacted GI's supplier

18   for Wagyu beef. Nishikawa also told me point blank he plans to sell Wagyu beef in the U.S.

19   Wagyu beef is one of GI's primary product lines, accounting for as substantial part of Geller's

20   business.

21       14.    It is highly unlikely that Nishikawa could establish a competing business so

22   quickly without using GI's confidential information. Even if he could identify the proper contact

23   persons and satisfying himself of their credit worthiness, a salesperson would still not be able to

24   fill a customer's order without knowing which suppliers had been used by GI for each product

25   category sold, past pricing, quality, history, freight preferences, delivery schedules and other

26   customer preferences.

27       15.    Nishikawa finally returned the GI laptop computer on or about September 17,

28   2007. However, when I reviewed the laptop, I found that Nishikawa had deleted all of the GI

FUTTERMAN &
DUPREE LLP

DECLARATION OF J. GELLER IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. C 07-05159 MMC

1  confidential information stored thereon. As there was no data on the computer accessible to me,

2  I was not able recover my business data and information that GI paid Nishikawa to maintain. I

3  believe Nishikawa wiped the hard drive or replaced the hard drive to prevent me from having

4  access to the business information stored thereon. Despite being asked and instructed to do so,

5  Nishikawa did not store information saved on the lap top computer onto other GI computers. I

6  believe he did this to because he was planning on competing and wanted to deprive GI of the

7  information to give him an unfair advantage. I also believe that Nishikawa has retained and

8  continues to use that information to compete unfairly with GI.

9       16.     GI has taken me years to build, and I have spent countless hours of my own time

10 to develop the company's confidential information concerning buyers and sellers and their

11 respective requirements. GI will be irreparably harmed if Nishikawa is allowed to continue using

12 GI's confidential information to compete with GI in the specialty food market.

13      17.     I have read Steve Walker's Declaration In Support Of Plaintiff's Motion For

14 Temporary Restraining Order And Preliminary Injunction. On the facts stated in Paragraph 10 (a)

15 of this declaration, Spingtech is the buyer of the scallops order that Nishikawa stole from Geller

16 and, indeed, Exhibit A to the Walker Declaration shows Nishikawa had a Purchase Order for this

17 scallops order by at least September 6, 2007—less than 18 hours after leaving Geller at about

18 5:30 p.m. on September 5, 2007. On the facts stated in Paragraph 10(b) of the Walker

19 Declaration, Carlton Oshiro represents a distributor in Hawaii that I had contacted and

20 established as a potential distributor and further had approved Nishikawa's to visit them on

21 behalf of Geller (See Paragraph 12, above). Further, this shows that Nishikawa purports to have

22 established a relationship with Geller's importer for Wagyu beef. I believe Nishikawa

23

24 ///

25 ///

26 ///

27

28

1  has told Geller customers, whom he only did business with after joining Geller, that he offers
2  same terms, pricing, and supplier for Wagyu beef as Geller does.

3      I declare under penalty of perjury under the laws of the State of California that the
4  foregoing is true and correct.

5      Signed this _11th_ day of _October_, 2007 at _Burlingame_, California.

6

7

8                                James Geller

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FUTTERMAN &
DUPREE LLP

7

DECLARATION OF J. GELLER IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. C 07-05159 MMC

# EXHIBIT A

**Geller International, Inc.**
1799 Old Bayshore Hwy, Burlingame, Calif. 94010 ~ USA
Phone 650-692-6488 ~ Fax 650-692-5088
E-mail: jgeller@gellerinternational.com

## EMPLOYMENT AGREEMENT

This Agreement made and entered into this 11th day of April, 2003,
By and between GELLER INTERNATIONAL, INC ("employer"), and HITOSHI NISHIKAWA
("CONTRACTOR-COMMISION SALES"). The parties recite that:

A. Employer is engaged in IMPORT/EXPORT SALES, OF U.S. FOODS, and maintains business premises at
1799 Old Bayshore Hwy, Burlingame, Ca USA.

B. Mr. Nishikawa is willing to be contracted by employer, and employer is
Willing to contract Mr. Nishikawa, on the terms and conditions hereinafter set
Forth. For the reasons set forth above, and in consideration of the
Mutual covenants and promises of the parties hereto, employer and
Contractor covenant and agree as follows:

1. AGREEMENT to contract for sales & management services.
   Employer hereby contracts Mr. Nishikawa at the above-mentioned
Premises, and contractor hereby accepts and agrees to such employment.

2. DESCRIPTION OF CONTRACTOR'S DUTIES
   Subject to the supervision and pursuant to the orders, advice, and
direction of employer, contractor shall perform such duties as are
customarily performed by one holding such position in other businesses or
enterprises of the same or similar nature as that engaged in by employer.
Contractor shall additionally render such other and unrelated services and
Employer may assign duties as to him from time to time.

3. MANNER OF PERFORMANCE OF CONTRACTOR'S DUTIES
   Contractor shall at all times faithfully, industriously, and to the best
of his ability, experience, and talent, perform all duties that may be
required of and from him pursuant to the express and implicit terms
hereof, to the reasonable satisfaction of employer. Such duties shall be
rendered at the abovementioned premises and at such other place or places
as employer shall in good faith require or as the interests, needs,
business, and opportunities of employer shall require or make advisable.

4. DURATION OF EMPLOYMENT
   The term of contract-employment shall be 1 year(s) at stage 1,
commencing on April 14th, 2003. On or about April 1 2004, the terms for stage 2
will be negotiated and Mr. Nishikawa will have the option to remain at
the current terms of contract-employment with a sales commission pay structure,
or have the option to change from a contractor on a sales commission basis, to
employment with salary & commission basis. On or about April 1, 2004 Mr. Nishikawa
will have the option to change his status of his employment with an opportunity to buy
into a limited partnership at 5% ownership. An additional 5% ownership will be offered
to Mr. Nishikawa at the commencement of his 4 th year of employment at Geller International, Inc.

5. COMPENSATION; REIMBURSEMENT
   Employer shall pay Contractor and Contractor agrees to accept from

**PAID**
File Rev # 5/29
GI/BKT - TBLC
01/03

payments
5/15/03  2,500⁰⁰
ck.# 162

employer, in full payment for Contractor's services hereunder, compensation at the rate of 70% of the net profit from each sale. Payable within 15 days of the closing of such sale, and the final payment being received from the bank, or customer.
In addition to the foregoing, employer will reimburse Contractor for any and all necessary, customary, and usual expenses incurred by him while traveling for and on behalf of the employer pursuant to employer's directions.

Employer will offer, for the 1st 3 months (April, May June 2003) a sum of US $5,000.00 per month, as a draw against future commissions. Mr. Nishikawa, by signing of this agreement, agrees to re-pay Employer the sum of US$ 1,000.00 per month for 15 months, until the load is paid in full. No interest will be levied against this draw on commissions.

## 6. CONTRACTOR'S LOYALTY TO EMPLOYER'S INTERESTS
Contractor shall devote all of his time, attention, knowledge, and skill solely and exclusively to the business and interests of employer, and employer shall be entitled to all benefits, emoluments, profits, or other issues arising from or incident to any and all work, services, and advice of Contractor. Contractor expressly agrees that during the term hereof he will not be interested, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, Contractor, or in any other form or capacity, in any other business similar to employer's business or any allied trade, except that nothing herein contained shall be deemed to prevent or limit the right of Contractor to invest any of his surplus funds in the capital stock or other securities of any corporation whose stock or securities are publicly owned or are regularly traded on any public exchange, nor shall anything herein contained by deemed to prevent Contractor from investing or limit Contractor's right to invest his surplus funds in real estate.

## 7. NONDISCLOSURE OF INFORMATION CONCERNING BUSINESS
Contractor will not at any time, in any fashion, form, or manner, either directly or indirectly divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of employer, including, without limitation, the names of any its customers, the prices it obtains or has obtained, or at which it sells or has sold its products, or any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would he deemed confidential, material, or important. The parties hereby stipulate that, as between them, the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of employer, and its good will, and that any breach of the terms of this section is a material breach of this agreement.

## 8. OPTION TO TERMINATE ON PERMANENT DISABILITY OF CONTRACTOR
Not withstanding anything in this agreement to the contrary, employer is hereby given the option to terminate this agreement in the event that during the term hereof Contractor shall become permanently disabled, as the term "permanently disabled" is hereinafter fixed and defined. Such option shall be exercised by employer giving notice to Contractor by registered mail, addressed to him in care of employer at the above stated

address, or at such other address as Contractor shall designate in writing,
of its intention to terminate this agreement on the last day of the month
during which such notice is mailed. On the giving of such notice this
agreement and the term hereof shall cease and come to an end on the last
day of the month in which the notice is mailed, with the same force and
effect as if such last day of the month were the date originally set
forth as the termination date. For purposes of this agreement, Contractor
shall be deemed to have become permanently disabled if, during any year
of the term hereof, because of ill health, physical or mental disability,
or for other causes beyond his control, he shall have been continuously
unable or unwilling or have failed to perform his duties hereunder for
thirty (30) consecutive days, or if, during any year of the term hereof,
he shall have been unable or unwilling or have failed to perform his
duties for a total period of thirty (30) days, whether consecutive or not.
For the purposes hereof, the term "any year of the term hereof" is
defined to mean any period of 12 calendar months commencing on the first
Day of April and terminating on the last day of April of the
following year during the term hereof.

## 9. DISCONTINUANCE OF BUSINESS AS TERMINATION OF EMPLOYMENT

Anything herein contained to the contrary notwithstanding, in the
Event that employer shall discontinue operations at the premises mentioned
above, then this agreement shall cease and terminate as of the last day
of the month in which operations cease with the same force and effect as
if such last day of the month were originally set forth as the
termination date hereof.

## 10. CONTRACTOR'S COMMITMENTS BINDING ON EMPLOYER ONLY ON WRITTEN CONSENT

Contractor shall not have the right to make any contracts or other
commitments for or on behalf of employer without the written consent of
employer.

## 11. CONTRACT TERMS TO BE EXCLUSIVE

This written agreement contains the sole and entire agreement between
The parties, and supersedes any and all other agreements between them.
The parties acknowledge and agree that neither of them has made any
representation with respect to the subject matter of this agreement or
any representations inducing the execution and delivery hereof except
such representations as are specifically set forth herein, and each party
acknowledges that he or it has relied on his or its own judgment in
entering into the agreement. The parties further acknowledge that
any statements or representations that may have heretofore been made
by either of them to the other are void and of no effect and that
neither of them has relied thereon in connection with his or its dealings
with the other.

## 12. WAIVERS OR MODIFICATION INEFFECTIVE UNLESS IN WRITING

No waiver or modification of this agreement or of any covenant,
condition, or limitation herein contained shall be valid unless in
writing and duly executed by the party to be charged therewith.
Furthermore, no evidence of any waiver or modification shall be offered
or received in evidence in any proceeding, arbitration, or litigation
between the parties arising out of or affecting this agreement, or the
rights or obligations of any party hereunder, unless such waiver or
modification is in writing, duly executed as aforesaid. The provisions
of this paragraph may not be waived except as herein set forth.

## 13. CONTRACT GOVERNED BY LAW

This agreement and performance hereunder shall be construed in accordance with the laws of the State of California.

## 14. BINDING EFFECT OF AGREEMENT

This agreement shall be binding on and inure to the benefit of The respective parties and their respective heirs, legal representatives, successors, and assigns.

15. Health benefits, in year 1 for Mr. Nishikawa are to be paid by Mr. Nishikawa. (*) Health benefits, in year 2 and forward, for Mr. Nishikawa are to be paid by the employer Should Mr. Nishikawa join the company as an employee, but not paid should he remain as a contractor.
(*) The employer will consider payment of health benefits in year one, after 6 Months of employment are complete, based on the employees sales and generation of profits.

Executed on the date first above written.

_____, Employer          _____, Contractor

James M. Geller Date: 4/11/03          Hitoshi Nishikawa date: 4-11-2003

# EXHIBIT B

LAW OFFICES OF

# DERENTHAL & DANNHAUSER LLP
ONE POST STREET, SUITE 575
SAN FRANCISCO, CALIFORNIA 94104
(415) 981-4844
FACSIMILE: (415) 981-4840

September 10, 2007

BY FEDERAL EXPRESS

Mr. Hitoshi Nishikawa
215 Catalina Avenue
Pacifica, California 94044

Re : Geller International, Inc.

Dear Mr. Nishikawa:

We represent Geller International, Inc. ("Geller") to whom you rendered services from April 2003 until your relationship terminated September 5, 2007.

Upon your departure, you took with you a Sony Vaio laptop computer that is the property of Geller. More importantly, the computer included Geller's proprietary information concerning its customers, suppliers and accounts. You are therefore in possession of both equipment and intellectual property belonging to Geller.

On behalf of Geller, I hereby demand that you promptly return to Geller the computer, along with any other Geller personal property you may have in your possession, including, without limitation, all originals or copies of records of Geller customers, suppliers and accounts and any other proprietary information in your possession which you may have obtained while representing Geller in doing business on its behalf. You may delete any personal information you may have on the computer, but you may not copy, reproduce or retain any information relating to Geller's business.

Be advised that Geller will consider you to be in violation of its rights under law and contract to the extent that you may now or in the future possess or use any information relating to Geller's business operations, including, without limitation, any information relating to Geller's customers, suppliers, products or accounts, to which you may have had access in connection with your rendering services to Geller. Such information is proprietary to Geller and constitutes its trade secrets and intellectual property. Geller hereby demands that you cease and desist in any such use if you are currently exploiting any such proprietary information for your own benefit. If you should use any such information for any commercial purposes or otherwise to compete with or damage Geller's business, Geller will take action to enjoin such use and to recover any damages you may cause by such use and any profits you may derive from such use, along with any costs it may incur to achieve these remedies.

If you do not promptly return all Geller property in your possession to Geller, we will be compelled to take legal action to protect its property, rights and interests.

Very truly yours,

Paul J. Derenthal

cc:  James M. Geller

# EXHIBIT C

**From:** Rosa, Joe [mailto:jrosa@JohnMorrell.com]
**Sent:** Friday, September 28, 2007 10:01 AM
**To:** jgeller@gellerinternational.com
**Subject:** FW: Asia International, Inc.

fyi

Thanks

Joe Rosa

Mohawk Packing Company
1660 Old Bayshore Hwy
San Jose, CA 95112
PH# 408-467-9704
Fax# 408-436-7457

*This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

**From:** Hitoshi Nishikawa - Asia International [mailto:hitoshinishikawa@sbcglobal.net]
**Sent:** Friday, September 28, 2007 9:44 AM
**To:** Rosa, Joe
**Subject:** Asia International, Inc.

Dear Joe,

Mr. Shoji Fujii of "Pisalo" called me last night and sent following e-mail.
He congratulate me for the set of my own business and will give me full support.
As you are aware, Mr. Fujii is buyer of our sliced pork bellies.

Mr. Fujii requested me to secure latest price based on October shipment.
Please give us offer price.
Thank you.

Regards

----- Original Message -----
**From:** pisalo@sd6.so-net.ne.jp
**To:** Hitoshi Nishikawa - Asia International
**Sent:** Thursday, September 27, 2007 7:18 PM
**Subject:** Re: Asia International, Inc.

メール拝見しました
創業は何かと大変ですが全ては　心の持ち様です
出来る事全力で気軽にやりきる　自分の出来る分は
それ以上出来ません　買ってくれる人も大切ですが
売ってくれる人はもっと大切です　とにかく笑顔でやりましょう
メールに西川さんの可愛い笑顔添付してみては‥‥‥
おじさんの勝手なひとり言です　　　　藤井　正二

----- Original Message -----
From: Hitoshi Nishikawa - Asia International
To: Shoji Fujii
Sent: Friday, September 28, 2007 2:15 AM
Subject: Asia International, Inc.

藤井社長


先日、藤井社長から継続してサポート、アドバイスを頂けると励ましの言葉を頂戴し大変うれしく光栄です。

久しぶりに元気な声でインドネシアからえびの輸入もされる事をお聞きし私も頑張って会社を成功させないといけないと思いました。
私も初心に帰り真剣にプロジェクトに取り組んで行きますので宜しくお願い申しあげます。

これからも社長からのご支援、アドバイスをお願い申しあげます。



西川


-----------------------------
Hitoshi Nishikawa
Asia International, Inc.
215 Catalina Avenue
Pacifica, CA 94044
Tel.(650)738-0852
Fax.(650)738-1746
Cell.(650)438-9484
E-mail: hitoshinishikawa@sbcglobal.net
-----------------------------