DILLINGHAM & MURPHY, LLP
CARLA J. HARTLEY (SBN 117213)
BARBARA L. HARRIS CHIANG (SBN 206892)
225 Bush Street, 6th Floor
San Francisco, California 94104-4207
Telephone:   (415) 397-2700
Facsimile:   (415) 397-3300

Attorneys for Defendants HITOSHI NISHIKAWA
And ASIA INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| GELLER INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> HITOSHI NISHIKAWA, and ASIA INTERNATIONAL, INC., <br><br> Defendants. | Case No. C-075159 MMC <br><br> **DECLARATION OF HITOSHI NISHIKAWA IN OPPOSITION TO PLAINTIFF'S RENEWED EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY AND AN ORDER TO SHOW CAUSE REGARDING A PRELIMINARY INJUNCTION AGAINST DEFENDANTS** |

1. I am the president of Asia International, Inc. ("Asia International") and am a named defendant in this action. I make this declaration in opposition to the ex parte application of plaintiff Geller International, Inc. ("Geller International") for an order permitting expedited discovery and a temporary restraining order. If called as a witness, I could and would testify to the matters set forth in this declaration based on my personal knowledge.

2. I joined Geller in April 2003. I have been in the food export business for over 25 years. Prior to joining Geller International, I worked for Oritz Corporation for 20 years as the import/export manager and was primarily responsible for developing and finding business for Asian customers. I was also responsible for Wagyu beef import from Japan and its sales in US.

3. When I initially joined Geller International in 2003 I was attracted to the potential partnership offer in the employment contract. After joining Geller, I found out, however, that I

Page 1 – C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Ex Parte Motion For Temporary Restraining Order

was generating majority of all business for Geller International. At that time I was receiving 70% commission on all sales generated by me. Although, pursuant to the terms of the employment agreement, I was entitled to a small partnership in the business, I was not interested because Geller told me that if I became a partner in the business my commission would be reduced to 50%, which from my perspective did not make business sense. The Agreement that I signed on April 11, 2003 is attached hereto as Exhibit A.

4. In late August 2007, I approached Geller and told him I was unhappy at Geller International. I believed Geller International improperly calculated and paid my commissions from 2003 through 2006. Geller told me he was sorry I felt that way and said he would see if he could come up with a better proposal. He mentioned the possibility of a partnership. I told him if we could not work something out that I was going to go out on my own and start my own company on October 1, 2007. He told me he would get back to me.

5. When I did not hear back from Geller, I approached him again on September 5, 2007, and asked him what his thoughts were on the partnership proposal. I believe he said he was thinking that I would get about 20% to 30% in the business. I told him I wanted more than 50% of the business because I was the one who had developed the business at Geller International and was generating majority of business. Geller told me to pack up my stuff and leave and not come back.

6. Geller asked me to leave my computer. When he asked for the computer I told him since he was keeping the refrigerator that we jointly purchased for the company, I would keep the computer. I believed the arrangement was acceptable to Geller because he said nothing else.

7. Geller International provided the computer for me to use during my employment. There were three other computers in the office, however, they were not connected in any way. The only way to transfer information from one computer to another was by email. When I received the computer there was no company information on it at all. To my knowledge Geller International did not have any customer list when I started working there. The first time I am aware that customers were written down was approximately three (3) three months ago when Geller and I wrote down a list of Wagyu customers in order to allow us to cover customers if one of us was out of the office. Customer names were written down but restricted to Wagyu beef only. We decided

Page 2 – C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Ex Parte Motion For Temporary Restraining Order

1  to do this after a customer called the office while Geller was out and we were unable to follow up.
2  At no time did Geller ever tell me this information or any information was confidential or ask me
3  to keep it confidential.

4      8. Prior to my employment with Geller International it did not have any restaurants as
5  customers and did not import any Wagyu (Kobe) beef from Japan. I was the one who initiated
6  Wagyu business because of my contact with Zennoh (Farmer's cooperative) in Japan. I dealt with
7  Zennoh for the last 20 years. I was familiar with Wagyu business since I was in charge of handling
8  Wagyu business when I was with Oritz, my former employee. Wagyu beef import to US was
9  banned for approximately 5 years but ban was lifted March of 2005.

10      9. In or about March 2005, Zennoh nominated Poseidon Seafood, located in Los Angeles
11  as an importer of Wagyu beef to US. I met Poseidon and Zennoh in Los Angeles when Zennoh
12  had a demonstration or food show March 2005.

13      10. In 2006 I prepared a spreadsheet of containing information allowing me to track my
14  commission because I did not believe I was being properly compensated. It included invoice
15  dates, numbers, item description, price, customer name and total invoice price. No one at the
16  company directed me to prepare this spreadsheet. I showed this spreadsheet to Geller in or about
17  June 2007. I did not give him a copy and he never asked for a copy. I still have a copy of this
18  spreadsheet which I prepared. I also have in my possession commission slips that were given to
19  me by Geller documenting my commissions, and several Federal Express invoices showing the
20  cost of Federal Express charges, which were less than I was charged for sending packages to
21  buyers. These are the only Geller International documents I currently have in my possession.

22      11. I am not aware that Geller International ever checked on the credit worthiness of
23  any of its buyers.

24      12. On or about September 25, 2007, I incorporated Asia International, Inc. I did not
25  do any business on behalf of myself or Asia International or take any steps to begin setting up my
26  own business until after Jim Geller terminated my employment on September 5, 2007. In forming
27  Asia International, I did not use or employ any documents, material, equipment, or other property
28  of Geller International.

Page 3 – C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Ex Parte Motion For Temporary Restraining Order

13. I have not transferred any Geller International information to Asia International computers.

14. When Geller International terminated my employment on September 5, 2007, I had been negotiating an order for 20,000 pound plus scallops for the buyer with the distributor. I had brief contact with those parties after my employment was terminated, but did not have any involvement with them after September 12 or 13, 2007. I have not been paid or received any compensation from the companies involved in the scallop transaction or any company that does business with Geller International since my termination on September 5, 2007. I did not receive any payment in connection with the scallop order, nor have I had any contact with the buyer or distributor involved in the transaction since September 12 or 13, 2007.

15. I developed the business with Prime One Twelve. A contact in New York told me that he had a customer interested in Wagyu beef and he gave me the telephone number of the chef at Prime One Twelve, Mike Sabin. I looked Prime One Twelve up on the Internet to get some background information about the type of meat they serve at the restaurant. I contacted Mr. Sabin several times after leaving Geller International. Prime One Twelve has never placed an order with me since I left Geller International, nor have I received any compensation from Prime One Twelve.

16. In general in locating new business contacts I generally locate my targets by conducting Internet searches. With regard to restaurant contacts, I search Web sites such as Opentable.com, Gayout.com, and search lists that name top restaurants around the country. After obtaining the initial information from the Internet, I make cold calls. As for Asian importers, I generally locate their contact information from their embassies, which maintain public lists of companies that import products.

17. A Japanese customer from my employer prior to Geller International contacted me after I left Geller International to place an order for pork belly. Geller International and I both had a relationship with this contact when I started working at Geller International in 2003. The pork product was developed by Mohawk Packing for Geller International at my direction. I was the one who gave Mohawk Packing the specifications for developing the product. I attempted to place

Page 4 – C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Ex Parte Motion For Temporary Restraining Order

order the on or about September 27, 2007, with Mohawk Packing Company, however, Mohawk refused to accept the order.

18. I have completely ceased from contacting buyers I developed while working at Geller International since September 19, 2007.

19. The proposed TRO would cause extensive prejudice to my business and customers, and would without any justification unreasonably invade my privacy and the privacy and customers of Asia International. The request that Asia International and I be enjoined precludes us from serving our clients on a daily basis. The TRO would also cause irreparable harm to me and my family. I have three sons to support and a TRO would make it virtually impossible for me to make a living in the business I have been working in for over 25 years.

20. The computer that Geller International provided for my use crashed in April 2007 and the hard drive was replaced. On or about September 8 or 9, 2007 (before I knew Geller International wanted the computer returned) while I was trying to back up the data, the computer again crashed. I had to restart the computer with a recovery disk. I have in my possession the external drive that I was using to attempt to back up the data. To my knowledge, there is no accessible information on that external drive. I left for a business trip to Hawaii on or about September 10, 2007, at 9:00 a.m. A true and correct copy of my United mileage summary reflecting the dates I flew to Hawaii is attached hereto as Exhibit B. While I was gone, Geller International sent a letter via Federal Express to me demanding the return of the computer. I returned from Hawaii on Saturday, September 15, 2007 at approximately 8:30 p.m. I returned the computer to Geller International the next business day, on or about Monday, September 17, 2007. To date Geller has never reimbursed me for underpayment on my commissions and the refrigerator that was purchased with my own money for Geller International's use.

21. Geller never instructed me to transfer any data from my work computer to any Geller International computer.

22. A business contact advised me that Geller told them they could not do business with me because my contract with Geller International prohibited it. I am unaware of any contract provision that prohibits customers from contacting me.

Page 5 – C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Ex Parte Motion For Temporary Restraining Order

1  I declare under penalty of perjury under the laws of the United States of America and the
2  State of California that the foregoing is true and correct. Dated this 22nd day of October, 2007, at
3  Pacifica, California.

*[signature]*

Hitoshi Nishikawa

# Exhibit A

Geller International, Inc.
1799 Old Bayshore Hwy, Burlingame, Calif. 94010 ~ USA
Phone 650-692-6488 ~ Fax 650-692-5088
E-mail: jgeller@gellerinternational.com

EMPLOYMENT AGREEMENT

This Agreement made and entered into this 11th day of April, 2003,
By and between GELLER INTERNATIONAL, INC ("employer"), and HITOSHI NISHIKAWA
("CONTRACTOR-COMMISION SALES"). The parties recite that:

A. Employer is engaged in IMPORT/EXPORT SALES, OF U.S. FOODS, and maintains business premises at
1799 Old Bayshore Hwy, Burlingame, Ca USA.

B. Mr. Nishikawa is willing to be contracted by employer, and employer is
Willing to contract Mr. Nishikawa, on the terms and conditions hereinafter set
Forth. For the reasons set forth above, and in consideration of the
Mutual covenants and promises of the parties hereto, employer and
Contractor covenant and agree as follows:

1. AGREEMENT to contract for sales & management services.
   Employer hereby contracts Mr. Nishikawa at the above-mentioned
Premises, and contractor hereby accepts and agrees to such employment.

2. DESCRIPTION OF CONTRACTOR'S DUTIES
   Subject to the supervision and pursuant to the orders, advice, and
direction of employer, contractor shall perform such duties as are
customarily performed by one holding such position in other businesses or
enterprises of the same or similar nature as that engaged in by employer.
Contractor shall additionally render such other and unrelated services and
Employer may assign duties as to him from time to time.

3. MANNER OF PERFORMANCE OF CONTRACTOR'S DUTIES
   Contractor shall at all times faithfully, industriously, and to the best
of his ability, experience, and talent, perform all duties that may be
required of and from him pursuant to the express and implicit terms
hereof, to the reasonable satisfaction of employer. Such duties shall be
rendered at the abovementioned premises and at such other place or places
as employer shall in good faith require or as the interests, needs,
business, and opportunities of employer shall require or make advisable.

4. DURATION OF EMPLOYMENT
   The term of contract-employment shall be 1 year(s) at stage 1,
commencing on April 14th, 2003. On or about April 1 2004, the terms for stage 2
will be negotiated and Mr. Nishikawa will have the option to remain at
the current terms of contract-employment with a sales commission pay structure,
or have the option to change from a contractor on a sales commission basis, to
employment with salary & commission basis. On or about April 1, 2004 Mr. Nishikawa
will have the option to change his status of his employment with an opportunity to buy
into a limited partnership at 5% ownership. An additional 5% ownership will be offered
to Mr. Nishikawa at the commencement of his 4 th year of employment at Geller International, Inc.

5. COMPENSATION; REIMBURSEMENT
   Employer shall pay Contractor and Contractor agrees to accept from

employer, in full payment for Contractor's services hereunder, compensation at the rate of 70% of the net profit from each sale. Payable within 15 days of the closing of such sale, and the final payment being received from the bank, or customer.
In addition to the foregoing, employer will reimburse Contractor for any and all necessary, customary, and usual expenses incurred by him while traveling for and on behalf of the employer pursuant to employer's directions.

Employer will offer, for the 1st 3 months (April, May June 2003) a sum of US $5,000.00 per month, as a draw against future commissions. Mr. Nishikawa, by signing of this agreement, agrees to re-pay Employer the sum of US$ 1,000.00 per month for 15 months, until the load is paid in full. No interest will be levied against this draw on commissions.

## 6. CONTRACTOR'S LOYALTY TO EMPLOYER'S INTERESTS

Contractor shall devote all of his time, attention, knowledge, and skill solely and exclusively to the business and interests of employer, and employer shall be entitled to all benefits, emoluments, profits, or other issues arising from or incident to any and all work, services, and advice of Contractor. Contractor expressly agrees that during the term hereof he will not be interested, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, Contractor, or in any other form or capacity, in any other business similar to employer's business or any allied trade, except that nothing herein contained shall be deemed to prevent or limit the right of Contractor to invest any of his surplus funds in the capital stock or other securities of any corporation whose stock or securities are publicly owned or are regularly traded on any public exchange, nor shall anything herein contained by deemed to prevent Contractor from investing or limit Contractor's right to invest his surplus funds in real estate.

## 7. NONDISCLOSURE OF INFORMATION CONCERNING BUSINESS

Contractor will not at any time, in any fashion, form, or manner, either directly or indirectly divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of employer, including, without limitation, the names of any its customers, the prices it obtains or has obtained, or at which it sells or has sold its products, or any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important. The parties hereby stipulate that, as between them, the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of employer, and its good will, and that any breach of the terms of this section is a material breach of this agreement.

## 8. OPTION TO TERMINATE ON PERMANENT DISABILITY OF CONTRACTOR

Not withstanding anything in this agreement to the contrary, employer is hereby given the option to terminate this agreement in the event that during the term hereof Contractor shall become permanently disabled, as the term "permanently disabled" is hereinafter fixed and defined. Such option shall be exercised by employer giving notice to Contractor by registered mail, addressed to him in care of employer at the above stated

address, or at such other address as Contractor shall designate in writing, of its intention to terminate this agreement on the last day of the month during which such notice is mailed. On the giving of such notice this agreement and the term hereof shall cease and come to an end on the last day of the month in which the notice is mailed, with the same force and effect as if such last day of the month were the date originally set forth as the termination date. For purposes of this agreement, Contractor shall be deemed to have become permanently disabled if, during any year of the term hereof, because of ill health, physical or mental disability, or for other causes beyond his control, he shall have been continuously unable or unwilling or have failed to perform his duties hereunder for thirty (30) consecutive days, or if, during any year of the term hereof, he shall have been unable or unwilling or have failed to perform his duties for a total period of thirty (30) days, whether consecutive or not. For the purposes hereof, the term "any year of the term hereof" is defined to mean any period of 12 calendar months commencing on the first Day of April and terminating on the last day of April of the following year during the term hereof.

## 9. DISCONTINUANCE OF BUSINESS AS TERMINATION OF EMPLOYMENT

Anything herein contained to the contrary notwithstanding, in the Event that employer shall discontinue operations at the premises mentioned above, then this agreement shall cease and terminate as of the last day of the month in which operations cease with the same force and effect as if such last day of the month were originally set forth as the termination date hereof.

## 10. CONTRACTOR'S COMMITMENTS BINDING ON EMPLOYER ONLY ON WRITTEN CONSENT

Contractor shall not have the right to make any contracts or other commitments for or on behalf of employer without the written consent of employer.

## 11. CONTRACT TERMS TO BE EXCLUSIVE

This written agreement contains the sole and entire agreement between The parties, and supersedes any and all other agreements between them. The parties acknowledge and agree that neither of them has made any representation with respect to the subject matter of this agreement or any representations inducing the execution and delivery hereof except such representations as are specifically set forth herein, and each party acknowledges that he or it has relied on his or its own judgment in entering into the agreement. The parties further acknowledge that any statements or representations that may have heretofore been made by either of them to the other are void and of no effect and that neither of them has relied thereon in connection with his or its dealings with the other.

## 12. WAIVERS OR MODIFICATION INEFFECTIVE UNLESS IN WRITING

No waiver or modification of this agreement or of any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the party to be charged therewith. Furthermore, no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this agreement, or the rights or obligations of any party hereunder, unless such waiver or modification is in writing, duly executed as aforesaid. The provisions of this paragraph may not be waived except as herein set forth.

13. CONTRACT GOVERNED BY LAW
   This agreement and performance hereunder shall be construed in accordance with the laws of the State of California.

14. BINDING EFFECT OF AGREEMENT
   This agreement shall be binding on and inure to the benefit of The respective parties and their respective heirs, legal representatives, successors, and assigns.

15. Health benefits, in year 1 for Mr. Nishikawa are to be paid by Mr. Nishikawa. (*)
   Health benefits, in year 2 and forward, for Mr. Nishikawa are to be paid by the employer Should Mr. Nishikawa join the company as an employee, but not paid should he remain as a contractor.
   (*) The employer will consider payment of health benefits in year one, after 6 Months of employment are complete, based on the employees sales and generation of profits.

Executed on the date first above written.

_____, Employer       _____, Contractor
James M. Geller  Date: 4/11/03         Hitoshi Nishikawa  date: 4-11-2003

Exhibit B

Account summary                                    Page 1 of 1

# UNITED

## My mileage summary
### Account summary

Account number:                              0009·
Membership level:                            Premier
Current redeemable miles balance:
Year to date Elite Qualifying Miles (EQM):
Year to date Elite Qualifying Segments (EQS):
Lifetime United flight miles:
Redeemable miles expiration date:

Your Redeemable miles expiration date now reflects the 18-month expiration policy for Mileage Plus miles. For more information visit united.com/expiringmiles.

As a Mileage Plus Visa cardmember, you can redeem for exclusive travel awards with no blackout dates or inventory restrictions. To check your miles available for Mileage Plus Choices℠ program redemption or for complete program details, visit united.com/choices.

## Redeemable miles activity from Sep 01, 2007 To Oct 19, 2007

| Date | Activity | Miles added/deducted | Elite bonus | Fare bonus | Total |
|---|---|---|---|---|---|
| Sep 10, 2007 | UA 73 T Class SFO to HNL | 2,396 | 600 | 0 | 2,996 |
| Sep 15, 2007 | UA 52 T Class KOA to SFO | 2,370 | 593 | 0 | 2,963 |

Period total:

## Category summary from Sep 01, 2007 To Oct 19, 2007

| Program | Added | Deducted |
|---|---|---|
| United | | |
| Star Alliance | | |
| All Airlines | | |
| Hotel | | |
| Car | | |
| Other | | |
| **Total** | | |

## Change view of account activity details

You may view your current program balance and your account activity for the entire previous calendar year. Please enter the desired range.

From:                          To:
Sep · 01 · 2007 ·              Oct · 19 · 2007 ·

Categories:
[✓] United       [✓] Star Alliance    [✓] All airlines
[✓] Hotel        [✓] Car              [✓] Other

View

Español | About United | Investor relations | Business resources | Careers | Site map
Compatible browsers | Terms and conditions | Privacy | Special Terms and Conditions | © 2007 United Air Lines, Inc.


Renewing our promise to you
Learn more about our commitment to customers.
Details


Your Elite Choice: Multiple chances to win a trip to Beijing. Experience a luxury journey to one of Asia's oldest cities.
Details


Your next award ticket just got closer
Redeem just 15,000 miles for short haul award trips.
Details

New: Add 1,000 miles to your next flight
Register to add 1,000 miles to your next flight for just $20.
Details


Great wines come with miles and savings
Earn 25 miles per dollar and save 30% with Hartwick & Grove.
Details


UNITED
Mileage Plus Mall
Find scary good deals at Mileage Plus Mall
Earn miles when you begin your Halloween shopping with us.
Details

Oct 19 07 05:22p    Asia International                     650 738 1746         p.2
Case 3:07-cv-05159-MMC    Document 17    Filed 10/22/2007    Page 14 of 15
Account summary                                                            Page 1 of 1

# UNITED

## My mileage summary
### Account summary

Account number:                         0009-
Membership level:                       Premier
Current redeemable miles balance:
Year to date Elite Qualifying Miles (EQM):
Year to date Elite Qualifying Segments (EQS):
Lifetime United flight miles:
Redeemable miles expiration date:

Your Redeemable miles expiration date now reflects the 18-month expiration policy for Mileage Plus miles. For more information visit united.com/expiringmiles.

As a Mileage Plus Visa cardmember, you can redeem for exclusive travel awards with no blackout dates or inventory restrictions. To check your miles available for Mileage Plus Choices℠ program redemption or for complete program details, visit united.com/choices.

### Redeemable miles activity from Sep 01, 2007 To Oct 19, 2007

| Date | Activity | Miles added/deducted | Elite bonus | Fare bonus | Total |
|---|---|---|---|---|---|
| Sep 10, 2007 | UA 73 T Class SFO to HNL | 2,396 | 600 | 0 | 2,996 |
| Sep 15, 2007 | UA 52 T Class KOA to SFO | 2,370 | 593 | 0 | 2,963 |

Period total:

### Category summary from Sep 01, 2007 To Oct 19, 2007

| Program | Added | Deducted |
|---|---|---|
| United | | |
| Star Alliance | | |
| All Airlines | | |
| Hotel | | |
| Car | | |
| Other | | |
| Total | | |

### Change view of account activity details

You may view your current program balance and your account activity for the entire previous calendar year. Please enter the desired range.

From:                    To:
Sep - 01 - 2007          Oct - 19 - 2007

Categories:
[✓] United        [✓] Star Alliance     [✓] All airlines
[✓] Hotel         [✓] Car               [✓] Other

View

Español | About United | Investor relations | Business resources | Careers | Site map
Compatible browsers | Terms and conditions | Privacy | Special Terms and Conditions | © 2007 United Air Lines, Inc.


Renewing our promise to you
Learn more about our commitment to customers.
Details


Your Elite Choice: Multiple chances to win a trip to Beijing.
Experience a luxury journey to one of Asia's oldest cities.
Details


Your next award ticket just got closer
Redeem just 15,000 miles for short haul award trips.
Details


New: Add 1,000 miles to your next flight
Register to add 1,000 miles to your next flight for just $20.
Details


Great wines come with miles and savings
Earn 25 miles per dollar and save 30% with Hartwick & Grove.
Details

# UNITED
Mileage Plus Mall
Find scary good deals at Mileage Plus Mall
Earn miles when you begin your Halloween shopping with us.
Details

# PROOF OF SERVICE

I am a citizen of the United States, and employed in the City and County of San Francisco. I am over the age of eighteen (18) years, and not a party to the within above-entitled action. My business address is 225 Bush Street, Sixth Floor, San Francisco, California 94104-4207. On October 22, 2007, I served the following document on the party listed below:

**DECLARATION OF HITOSHI NISHIKAWA IN OPPOSITION TO PLAINTIFF'S RENEWED EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY AND AN ORDER TO SHOW CAUSE REGARDING A PRELIMINARY INJUNCTION AGAINST DEFENDANTS**

XX    (BY FAX) By sending a true copy thereof by facsimile machine to the number listed below.

Daniel A. Croley
FUTTERMAN & DUPREE, LLP
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Tel: 415-399-3840
Fax: 415-399-3838
Email: dan@dfdlaw.com
*Attorney for Plaintiff GELLER INTERNATIONAL, INC.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 22, 2007, at San Francisco, California.

_____
Mardoux Graff

Case No. C-07-5159 MMC
PROOF OF SERVICE