DANIEL A. CROLEY (154386)
FUTTERMAN & DUPREE LLP
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
dan@dfdlaw.com

*Attorneys for Plaintiff
Geller International, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GELLER INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> HITOSHI NISHIKAWA, and ASIA INTERNATIONAL, INC., <br><br> Defendants. | Case No. 07-05159 MMC <br><br> **MEMORANDUM SUPPORTING PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION** <br><br> (Civil L.R. 7-10; 65-1) <br><br> Date: November 14, 2007 <br> Time: 9:00 a.m. <br> Complaint Filed: October 9, 2007 |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS .......................................................................................................... 4

    A.    Plaintiff's Factual Showing ........................................................................... 4

    B.    Defendant's Opposition ................................................................................. 6

ARGUMENT ............................................................................................................................... 8

    I.    GELLER'S REQUEST FOR INJUNCTIVE RELIEF IS PROPER ....................... 8

    II.    GELLER IS LIKELY TO PREVAIL .................................................................... 9

        A.    CFAA ............................................................................................................. 9

        B.    Plaintiff's Confidential Information Is Entitled To Legal Protection ........ 10

        C.    Defendants Misappropriated And Are Using Plaintiff's Confidential Information ............................................................................. 11

    III.    THE BALANCE OF HARMS TIPS SHARPLY IN GELLER'S FAVOR ........... 13

        A.    The Risk Of Harm To Geller Is Great Absent Interim Injunctive Relief ............................................................................................................ 13

        B.    The Requested Injunction Will Result In Minimal Interim Harm To Defendants .................................................................................................. 14

CONCLUSION .......................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir.1982) ...................................................................................3

*Basicomputer Corp. v. Scott*,
  973 F2d 507 (6th Cir. 1992) ....................................................................................14

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................................8

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F2d 86 (3rd Cir. 1992) ......................................................................................13

*Computer Assoc. Int'l, Inc. v. American Fundware, Inc.*,
  133 F.R.D. 166 (D.Colo.1990) ..................................................................................4

*Conn v. Sup. Ct.* (Farmers Group, Inc.)
  196 Cal. 3d 774 (1987) .......................................................................................2, 13

*Courtesy Temporary Service, Inc. v. Camacho*,
  222 Cal.App.3d 1278 (1990) ..............................................................................10, 13

*Greenly v. Cooper*,
  77 Cal.App.3d 382 (1978) .......................................................................................13

*Gresham v. Windrush Partners, Ltd.*,
  730 F2d 1417 (11th Cir. 1984) ................................................................................13

*Int'l Airport Centers, LLC v. Citrin*,
  440 F.3d 418 (7th Cir.2006) ......................................................................................9

*Klamath-Orleans Lumber, Inc. v. Miller*,
  87 Cal.App.3d 458 (1978) .................................................................................10, 13

*Morlife, Inc. v. Perry*,
  56 Cal.App.4th 1514 (1997) ...............................................................................10, 12

*National Ass'n of Radiation Survivors v. Turnage*,
  115 F.R.D. 543 (N.D. Cal. 1987) ...............................................................................3

*Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*,
  174 F.3d 801 (6th Cir. 1999) .....................................................................................4

*North Atlantic Instruments, Inc. v. Haber*,
  188 F3d 38 (2nd Cir. 1999) .....................................................................................13

*Pillsbury, Madison & Sutro v. Schectma*,
  55 Cal.App. 4th 1279 (1997) .....................................................................................2

*Raich v. Ashcroft,*
 352 F.3d 1222 (9th Cir. 2003) ................................................................................... 9

*Rent-A-Center, Inc. v. Canyon Television & Appliance,*
 944 F2d 597 (9th Cir. 1991) ..................................................................................... 13

*Residential Funding Corp. v. Degeorge Fin'l Corp.,*
 306 F.3d 99 (2d Cir. 2002) ........................................................................................ 4

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
 251 F3d 814 (9th Cir. 2001) ..................................................................................... 13

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,*
 60 F3d 27 (2nd Cir. 1995) ........................................................................................ 14

*ViChip Corp. v. Lee,*
 438 F.Supp.2d 1087 (N.D.Cal. 2006) ........................................................................ 9

*Whyte v. Schlage Lock Co.,*
 101 Cal. 4th 1443 (2002) .......................................................................................... 10

**Statutes and Rules**

18 U.S.C. §§ 1030(a)(5)(A-B) ....................................................................................... 9

CFAA § 1030(g) ............................................................................................................ 9

F.R.C.P. 65 ..................................................................................................................... 8

Uniform Trade Secrets Act ............................................................................................ 9

Computer Fraud and Abuse Act ............................................................................ 9, 13

Business & Profession Code § 17200 ............................................................................ 9

Business & Profession Code Section 17203 .................................................................. 9

Cal. Civ. Code 3426.2 .................................................................................................... 9

Cal. Civ. Code § 3426 *et seq.* ........................................................................................ 10

Cal. Civ. Code § 3426.1(b)(2) ....................................................................................... 12

Cal. Civ. Code § 3426.1(d) ............................................................................................ 10

Cal. Civ. Code §§3426.1 *et seq.* .................................................................................... 10

California Penal Code § 502(a) ..................................................................................... 9

# INTRODUCTION

Plaintiff Geller International ("Geller") seeks to prohibit a former contract sales representative, Hitoshi Nishikawa and his newly formed company, Asia International, Inc., from using Geller's confidential and trade secret business information to usurp Geller's business. On October 23, 2007[1], the Court temporarily enjoined Defendants, protecting Geller's confidential business information and, further, directing Defendants to return Geller electronic data immediately. (Temporary Restraining Order, ¶ 4). To date, Defendants have returned nothing pursuant to Paragraph 4 of the TRO. For all the reason stated below, the TRO should now be converted to a preliminary injunction pending trial.

Geller imports and exports specialty meat, seafood and other high-end, gourmet food products, buying from its network of niche food wholesalers to sell to its various customers (restaurants, chefs, etc.). The supply and customer chain is located throughout the United States of America and Asia. Geller currently has only two employees, including the founder, James Geller.

In 2003, Geller engaged Defendant Hitoshi Nishikawa as a commissioned sales agent. While working with Geller, Nishikawa had access to and became familiar with Geller's confidential and trade secret business information about its suppliers and customers. Geller also gave Nishikawa a laptop computer and that laptop contained detailed confidential information about Geller's business, including information about the identities, contact information, sales information, contract specifications and sales terms for supplier and buyers, and over two years' of detailed sales reports by customer.

It was about 11:00 a.m. on September 6, less than 18 hours after his business relationship with Geller had ended, when Nishikawa had stolen a $121,000 scallops order belonging to Geller. Nishikawa admits the theft—offering as his sole defense that he allegedly had not been paid as of October 22. (Nishikawa Dec. Opp. TRO, ¶ 14). Nishikawa's Declaration attempts to erase what he did do from September 6 to September 12 or 13 to usurp the sale from Geller and

---

[1] All date references are to 2007 unless otherwise stated.

offers no explanation about Nishikawa's for-profit venture role and interest in respect to this sale. (Nishikawa Dec. Opp. TRO, ¶ 14)

Despite request and without authorization, Nishikawa kept and used his Geller-issued laptop computer for twelve days after termination. Why he kept it is clear based on his later known actions: Nishikawa reformatted Geller's hard drive to effectively make Geller data inaccessible to Geller; connected portable USB drives to the laptop; saved essential Geller customers and supplier Excel spreadsheets onto the laptop from external drives to misuse such Geller data and deleted those same Geller spreadsheets a second time so Geller could not use them. As a result, Geller hired a computer expert who has recovered some Geller spreadsheets that Nishikawa twice attempted to destroy, but it is probable others were permanently destroyed. By reloading Geller spreadsheets onto the laptop, Nishikawa has admitted keeping and using electronic versions of Geller documents after his termination. Of course, the electronic trail makes shutting Nishikawa down even more difficult without injunctive relief. *See Conn v. Sup. Ct.* (Farmers Group, Inc.) 196 Cal. 3d 774, 788 (1987) (former employee held in contempt for disobeying order to return company documents); *see Pillsbury, Madison & Sutro v. Schectma*, 55 Cal. 4th 1279, 1289 (1997) (upholding preliminary injunction requiring attorney for former employee plaintiffs to return confidential personnel documents removed from employer's file without its consent for purpose of bolstering plaintiffs' case).

Nishikawa dances around his misuse of Geller confidential information, but with relish and gusto deceptively denies doing so in the limited area of "forming" a corporation. (Nishikawa Dec. Opp. TRO, ¶ 12) And, of the five known portable electronic storage devices Nishikawa used on Geller's lap top, Nishikawa admits having one external storage drive; misusing it <u>after</u> September 5 to allegedly "backup" or attempt to backup Geller data and making the data on the drive allegedly "inaccessible" most probably by reformatting it. (Nishikawa Dec. Opp. TRO, ¶ 20) Of course, Nishikawa offers no reasonable explanation for his actions and the Court should conclude spoliation most probably occurred. Moreover, Steve Walker, a computer forensic expert, has reviewed Nishikawa's contentions about how the computer alleged crashed and concluded they "cannot be true based on my forensic examination of the computer." (Walker

Dec. Supp Prelim Inj. ¶ 7) Walker has further concluded Nishikawa's assertions about not transferring Geller data to any Asia International, Inc. computer is misleading at best. (Walker Dec. Supp Prelim Inj. ¶ 8) In addition to the laptop, we know of at least three incidents occurring after Nishikiawa was terminated on September 5, 2007, which are summarized as:

1) September 6, 2007: Nishikawa usurped an order belonging to Geller for 21,000 pounds of frozen scallops, worth $121,000, and sold them to a Geller customer, notwithstanding that he had negotiated that same order for Geller on about September 4;

2) September 18, 2007: Nishikawa, one day after returning his laptop to Geller's offices and upon seeing a Geller box addressed to Prime 112 Restaurant in Miami, solicited the a sale from Prime 112; and

3) September 27, 2007: Nishikawa attempted to place order for a specialty pork product developed by Geller through a Geller supplier, Mohawk Packing Company ("Mohawk"), to send to a longstanding Japanese customer of Geller approximately 20,000 to 40,000 pounds of pork. Although Nishikawa has dealt with this Japanese customer before working at Geller, the specific product he is now attempting to take was developed through Geller.

By destroying at least some of the laptop files, Defendants have handicapped Geller's efforts to prove its case and, thus, the Court should draw the conclusion from Defendants' conduct that whatever they deleted must have been adverse to them in this litigation. Any evidence destroyed by Defendants must be assumed to be relevant and adverse to their position, for where "the relevance of ... [destroyed] documents cannot be clearly ascertained because the documents no longer exist," a party "can hardly assert any presumption of irrelevance as to the destroyed documents." *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir.1982). *See National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) (holding that where "the relevance and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist ... the culpable party can hardly assert any presumption of irrelevance as to the destroyed documents") (internal quotations

omitted); *see also Computer Assoc. Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 170 (D.Colo.1990); *Residential Funding Corp. v. Degeorge Fin'l Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999).

Geller will be irreparably harmed absent injunctive relief directing Defendants' to cease using Geller's confidential information. Geller is a small enterprise, with only two employees. Geller has spent years to develop this confidential information that is vital to its success and, ultimately, its viability. Unless the Court stops Nishikawa, he will continue to use this information to unfairly damage Geller and its goodwill.

Geller therefore urges the Court to issue a preliminary injunction to protect Geller's confidential and trade secret information.

## STATEMENT OF FACTS

### A.  Plaintiff's Factual Showing

The essential facts to support this motion are set forth in the Declarations of James Geller, Mike Fernandes, Joe Rosa and Steve Walker, which were filed in support of Geller's application for a temporary restraining order.[2] As these declarations show, almost immediately after leaving Geller on September 5, 2007 (or perhaps even before), Nishikawa was running a competing import-export business, stealing a six-figure order from Geller and using Geller's confidential information to cherry-pick Geller business. (Geller Dec., ¶6-7; Fernandes Dec. ¶¶ 3-6; Walker Dec. ¶¶ 5-13)

Nishikawa's actions with respect to the Geller laptop computer also raise an inference of unlawful misappropriation of Geller's protected information. For example, during his employment, Nishikawa kept buyer and supplier information, Geller pricing data and other confidential information on the laptop. (Geller Decl., ¶¶7, 15.) Despite requests, Nishikawa failed to save such information on Geller's office computers and, after leaving Geller, intended to destroy Geller data permanently. (Geller Dec., ¶¶7, 15) Upon leaving on September 5, 2007, Geller demanded Nishikawa immediately return its laptop computer. But, Nishikawa kept it twelve more days – returning it on September 17, 2007. (Geller Dec., ¶¶7-9, 15.) When Geller

---

[2] Unless otherwise stated, all citations to declarations are to those submitted with Geller's TRO Application.

4

received the laptop, Geller could not access Nishikawa's work files (Geller Dec., ¶¶ 7, 15) and consequently had to hire a computer forensic expert. (Walker Dec., ¶¶ 1-13; Geller Dec. ¶ 15.) Upon a forensic examination, Steven Walker found: 1) the hard drive was reformatted by replacing the operating system between September 8 and 9, 2007 which erased files (including Geller work product); 2) some Geller work product was re-copied onto the same hard drive between September 9 and 17, 2007 most probably from a portable storage devices (USB drive); 4) Geller files were, again, deleted from the lap top between September 9 and 17, 2007 and 5) some Geller files were recovered but it is likely significant Geller data was permanently destroyed and the exact quantity cannot be quantified. (Walker Decl., ¶¶ 11-13.) On these facts, Defendants' destruction of the laptop's hard drive is likely to constitute willful destruction of Geller's property and spoliation of evidence relevant to this lawsuit.

Geller spent consider time and resources to create what Nishikawa destroyed and misappropriated. Over the years, Plaintiff's founder, Jim Geller, has expended countless hours, time and money to assemble Geller's confidential customer and supplier information. (Geller Dec., ¶¶ 1-4, 17) This information is not publicly known or readily available. (Id.) Plaintiff's customer list was developed over several years and it would take a competitor a least twelve months – and probably much longer – to develop the same information. (Geller Decl., ¶¶ 2-4) Beyond information such as the customer's business name, contact information, address, and so forth, a salesperson would need to determine the creditworthiness of each prospective customer. (Geller Decl., ¶ 14.) After identifying the proper contacts and satisfying oneself on the creditworthiness, a salesperson would still not be able to switch the customer without knowing which suppliers had been used by Plaintiff for each product category sold, past pricing, quality, history, freight preferences, delivery schedules and other customer preferences. (Geller Decl, ¶¶ 2-4) Nishikawa had access to all of this information on the Geller's laptop computer. (Geller Decl., ¶ 7.)

Within two weeks after Nishikawa left, Nishikawa had stolen a six-figure order belonging to Geller and attempted to take other Geller business. Plaintiff has reason to believe that

Defendant Nishikawa was planning on soliciting other customers away from Plaintiff, causing Plaintiff further injury. (Geller Decl., ¶10-14.)

### B. Defendants' Opposition

In opposition to Plaintiff's request for a temporary restraining order, Defendants submitted an opposition brief, a declaration from defense counsel, and the Declaration of Hitoshi Nishikawa.[3] Not only does Defendants' opposition fail to refute Plaintiff's factual showing, Defendants *admit* most of the critical facts which led Geller to seek injunctive relief.

Defendants concede that "Geller had proprietary information and that certain customers would be protected trade secret information." (Defts.' Opp. Memo. at p. 5, lines 18-19.) They also admit that Nishikawa kept at least *some* of this information when he left the company. In particular, Nishikawa admits:

(a)  while he worked for Geller, he helped Geller develop business in various product lines, including Waygu beef (Nishikawa Decl., ¶8) and the pork product produced by Mohawk Packing (Nishikawa Decl., ¶17);

(b)  through his work at Geller, he had access to various types of confidential information about Geller's business, including detailed information regarding customers and their past orders (Nishikawa Decl., ¶¶7-8 and Defts.' Opp. Memo. at p. 5, lines 18-19);

(c)  he kept a copy of a "spreadsheet" containing detailed information on Geller's customers (Nishikawa Decl., ¶10);

(d)  he kept Geller's laptop computer after his termination (Nishikawa Decl., ¶6) and that he did not return it until September 17 (Nishikawa Decl., ¶20 and Defts.' Opp. Memo. at p. 3, lines 19-22);

(e)  he formed a competing business shortly after leaving Geller (Nishikawa Decl., ¶12);

(f)  after his termination, he had "contact" with the buyer and distributor for a 20,000 pound scallop order he had "been negotiating" for Geller (Nishikawa Decl., ¶14);

---

[3] Defendants present no corroborating evidence to support their opposition; unlike Plaintiff, they have not offered the declaration of a single third-party witness.

    (g)  he contacted Geller's customer Prime One Twelve "several times after leaving Geller International" (Nishikawa Decl., ¶15);

    (h)  after he left, he sought to place an order with Mohawk Packing for a specialty pork product that was developed "for Geller International" (Nishikawa Decl., ¶17 and Defts.' Opp. Memo. at p.3, lines 15-16.);

    (i)  he has an "external drive" that contains Geller's confidential customer and order information (Nishikawa Decl., ¶20 and Defts.' Opp. Memo. at p. 3, line 26- p.4, line 2); and

    (j)  he went to Hawaii at the time of the trade show Geller had set up (Nishikawa Decl., ¶20 and Defts.' Opp. Memo. at p. 3, line 19);

    (k)  he tried to "back up" information from the Geller laptop after his employment terminated (Defts.' Opp. Memo. at p. 7, lines 2-4).

  Critically, Nishikawa does not deny actually *using* Geller's information to solicit orders for his new business. Rather, he dances around this issue. He avers that "in *forming* Asia International, I did not use or employ any documents, material, equipment or other property of Geller International." Nishikawa Decl., ¶12 (emphasis added). Obviously, Nishikawa would not need to use Geller's customer information to *form* a new corporation. But he does not say that he has not used Geller's information to *operate* his new business or to develop sales for it. He also states that he has not "transferred any Geller International information to Asia International computers." Nishikawa Decl., ¶13. Again, this begs the question of whether or not he retained and/or is misusing Geller's confidential information for his competing business – regardless of whether that information was loaded onto one of Asia International's computers. He states that he has "not been paid or received any compensation" in connection with "the scallop order" (Nishikawa Decl., ¶14), but he does not refute the facts set forth in Mr. Fernandes' declaration that he tried to take this order away from Geller.

  Defendants also assert that Nishikawa developed information for his new business "independently." Defts.' Opp. Memo. at p. 5, lines 1-2; But Defendants provide absolutely no factual support for this argument. Nishikawa does not, for example, detail what steps he took to

7

identify customers or suppliers for Asia International or what efforts he made to generate business for that company. Given the timing of events – a span of less than a month – it is simply not credible that Nishikawa established a competing food import-export business without using *any* of Geller's confidential information. Indeed, his admissions about contacts he had with customers who he got to know while working for Geller strongly suggests he was using Geller's information to build his own business.

Nishikawa's self-serving statements about what he brought to Geller International are entirely irrelevant. There is no dispute that Nishikawa had experience in the food import-export business before Geller hired him. And there is no dispute that Nishikawa worked to help Geller develop various sales channels. The questions are (a) whether Nishikawa wrongfully took confidential and information belonging to Geller when he left the company, and (b) whether he has used that information to compete unfairly with Geller since that time.

Finally, Nishikawa's vague and self-serving statements about the "prejudice" injunctive relief would cause him are insufficient to meet his burden to rebut Geller's showing of irreparable harm. Nishikawa offers no details to show how his business might be affected if he were barred from using Geller's confidential customer information. The Court is not obliged to accept Nishikawa's unsupported assertions of harm.

## ARGUMENT

### I. GELLER'S REQUEST FOR INJUNCTIVE RELIEF IS PROPER

Federal courts have inherent equitable power to grant preliminary injunctions pursuant to Rule 65 of the Federal Rules of Civil Procedure. *See Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); Fed. R. Civ. Proc. 65. The Ninth Circuit has articulated the requirements for injunctive relief in the form of two alternative tests that lie on a continuum: The traditional test for granting injunctive relief requires the applicant to demonstrate: (1) a likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of hardships favors the applicant; and (4) whether any public interest favors granting an injunction.[4] Geller is entitled to an

---

[4] [The Ninth Circuit] also uses an alternative test that requires the applicant to demonstrate either: a combination of probable success on the merits and the possibility of irreparable injury; or serious questions going to the merits and that the balance of hardships tips sharply in the applicant's favor. These two tests are not inconsistent. Rather, they

injunction under either Ninth Circuit test both because (1) it is likely to succeed on the merits of its equitable relief claims and (2) it is likely to suffer irreparable injury absent an injunction, with the harm to Geller greatly outweighing any interim burden on Defendants.

In addition, the Computer Fraud and Abuse Act ("CFAA")[5], Uniform Trade Secrets Act[6], and Business & Profession Code Section 17200 ("UCL")[7] specifically authorize the grant of injunctions in circumstances precisely like these and further Geller seeks other equitable relief that includes compelling Defendants to return all property belonging to Geller.

## II.     GELLER IS LIKELY TO PREVAIL

### A.     CFAA

Geller's First Count against Defendants is brought under the CFAA. Geller's computer forensic expert, Steven Walker, has provided objective proof of Defendants' actions in violation of the CFAA. (Walker Dec. ¶¶ 7-13). To make out a claim under this statute, Geller must show Defendants have (1) intentionally accessed (2) a protected computer (3) without authorization, and (4) as a result of such conduct, (5) intentionally, recklessly or otherwise caused (6) damage. *See* 18 U.S.C. §§ 1030(a)(5)(A-B)." *ViChip Corp. v. Lee,* 438 F.Supp.2d 1087 (N.D.Cal. 2006), citing *Int'l Airport Centers, LLC v. Citrin,* 440 F.3d 418, 419-21 (7th Cir.2006). Here, Walker determined Nishikawa deleted and accessed Geller's computer files after his relationship with Geller ended, causing Geller damage within meaning of CFAA. *ViChip Corp. v. Lee supra* (departing and departed employees and agents deletion of files from company-issued laptop was without authorization and in violation of the CFAA). The same facts also show that Nishikawa likely violated California Penal Code Section 502(a) (Eleventh Count), which also provides a civil remedy for unauthorized computer access.

---

represent a continuum of equitable discretion, whereby the greater the relative hardship to the moving party, the less probability of success must be shown. (*Raich v. Ashcroft,* 352 F.3d 1222, 1227 (9th Cir. 2003) (citations and internal quotation marks omitted).)

[5] Although the CFAA is primarily a criminal statute, under § 1030(g), "any person who suffers damage or loss ... may maintain a civil action ... for compensatory damages and injunctive relief or other equitable relief."

[6] California Civil Code Section 3426.2 provides: "[a]ctual or threatened misappropriation may be enjoined." (Subd. (a).)

[7] See Business & Profession Code Section 17203 (authorizing injunctive relief)

### B. Plaintiff's Confidential Information Is Entitled To Legal Protection

Geller's Second Count is for misappropriation of trade secrets. Cal. Civ. Code § 3426 *et seq.* A trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and "(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d); *Whyte v. Schlage Lock Co.*, 101 Cal. 4th 1443, 1452 (2002). Plaintiff's detailed customer and supplier information qualify as "trade secrets" under California Civil Code § 3426.1 *et seq.*

California law recognizes that a customer list qualifies as a trade secret when "the secrecy of this information provides a business with a 'substantial business advantage.'" *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1522 (1997) (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal.App.3d 458, 465 (1978). In *Morlife*, the court distinguished between customer lists assembled through an employer's efforts to identify "customers with particular needs or characteristics," from customer lists which "embody information which is 'readily ascertainable' through public sources," and held that former employees can be prohibited from using the former information to "capture a share of the market." *Morlife, Inc. v. Perry*, 56 Cal.App.4th at 1521. As the *Morlife*, court recognized, customer lists have the necessary economic value to qualify as a trade secret since they "enable the former employee "to solicit both more selectively and more effectively." *Morlife, Inc. v. Perry*, 56 Cal.App.4th at 1522 (quoting *Klamath-Orleans Lumber, Inc. v. Miller, supra*, 87 Cal.App.3d at 466). The information Plaintiff seeks to protect in this case qualifies as a "trade secret" under the USTA – as well as for general protection under *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal.App.3d 1278, 1285 (1990).

The information Nishikawa has taken is not contained in any public lists, but was compiled by Jim Geller over many years in the food import-export business, specifically dealing with high-end commodities such as Kobe beef and fancy seafood – and the select group of businesses in the United States and Asia who buy and sell those gourmet products. (Geller Dec., ¶¶ 1-4, 14 and 16) The laptop Nitishikawa withheld (and then permanently erased substantial

amount of Geller spreadsheets and data) contained not only customer lists and contact information – extremely valuable in themselves, considering how many countries are involved – but also two years' worth of detailed sales history information such as the cuts of beef purchased, the size of the cuts, packaging and shipping preferences and pricing. (Geller Dec., ¶¶ 7-9, 15; Walker Dec. ¶8). This information has crucial economic value for Geller -- as a "middleman" selling a service, one of Geller's principal competitive advantages is the storehouse of information it has on buyers and sellers of the specialty commodities it handles. The fact that other companies do not have this information gives Geller a competitive edge in this specialized market. (Geller Decl., ¶¶1-4).

Geller's customer and supplier information could not be duplicated without substantial time, effort and money. (Geller Dec., ¶¶ 2-4, 14, 17.) Plaintiff's customer list was developed over several years and it would take a competitor months – and probably longer – to develop the same information. (Geller Decl,. ¶¶ 2-4.) For example, beyond identifying a potential customer, a salesperson would need to determine the credit worthiness of the prospective customers. (Geller Decl,. ¶¶ 1-4, 14, 17.) After identifying the proper contacts and satisfying oneself on the credit worthiness, a salesperson would still not be able to take the customer's business without knowing which suppliers had been used by Plaintiff for each product category sold, past pricing, quality, history, freight preferences, delivery schedules and other customer preferences. (Geller Decl, ¶¶ 2-4) Geller also took also reasonable steps to maintain the secrecy of this information. Geller Decl., ¶ 4).

C. **Defendants Misappropriated And Are Using Plaintiff's Confidential Information**

Even after Nishikawa's departure, it is likely Defendants still have and are using sensitive Geller information pertaining to its customers, suppliers and pricing, all of which has independent economic value to Geller and which Geller takes reasonable measures to protect from misuse. Based on Defendants' recent activities, and without the benefit of formal discovery, Plaintiff has strong evidence that Defendants are using Geller's confidential, trade-secret information to compete unfairly with Geller. (Walker Decl., ¶¶7-13.) As shown in the

11

supporting declarations of Jim Geller, Mike Fernandez, Joe Rosa and Steve Walker, almost immediately after leaving Geller, Nishikawa began soliciting business from Geller's suppliers and customers and, even worse, usurped an over $120,000 Geller opportunity for himself less than eighteen hours later. These contacts almost certainly could not have been made without access to Geller's confidential and trade-secret information.

Defendants misuse of Geller's laptop computer alone creates a powerful inference that they were and are continuing to misuse confidential Geller information. *Infra.* Section II A. The fact that Defendants selectively deleted only some of the information on that laptop computer indicates that at the very least they *reviewed* what was on the laptop and made a decision as to what information to erase versus what to leave. In fact, Nishikawa *admits* he still has an "external drive" containing Geller data. Nishikawa Decl., ¶20. Defendants could have also easily made a copy of that same information for use in their new, competing business. Until Plaintiff can conduct discovery into this issue, Plaintiff can only draw inferences from Defendants' conduct -- and all of that conduct is consistent with a hypothesis that Defendants did in fact take Geller's customer information and are using it to build their own business.

Defendants have actively solicited Geller's relationships in a manner warranting an injunction. In *Morlife, Inc. v. Perry*, 56 Cal.App.4th 514, 1522 (1997), the court found that the former employees' acts of soliciting their former employer's customers, including making telephone calls and visits to the customers, qualified as misappropriation of their former employer's trade secrets. *Morlife, Inc. v. Perry*, 56 Cal.App.4th at 1522. See also Civil Code §3426.1(b)(2).).

Consequently, Geller is likely to prevail on this claim, and the likelihood would only increase if the Court presumes Defendants misused Geller confidential data based on the probable destruction of the single best source of the evidence (e.g., laptop files) needed to prove Geller's claims. For the same reasons, Geller is likely to prevail on its Third Count for breach of Nishikawa's written agreement restricting his use of Geller confidential information[8], as well as on its Fifth Count for violation of the UCL.

---

[8] Even without rising to the level of "trade secret," Plaintiff's confidential customer information is entitled to

1    Geller is also likely to prevail on its equitable claim for Replevin (Seventh Count), since Defendants likely sill have Geller information and no doubt have electronic spread sheets belonging to Geller. *See Conn v. Sup. Ct.*, supra at 788 (former employee held in contempt for disobeying order to return company documents).

## III. THE BALANCE OF HARMS TIPS SHARPLY IN GELLER'S FAVOR.

### A. The Risk Of Harm To Geller Is Great Absent Interim Injunctive Relief

Irreparable harms follows from Defendants probable misuse of Geller's customers, supplier and other trade secret information. "(A)n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F2d 86, 92–93 (3rd Cir. 1992); *North Atlantic Instruments, Inc. v. Haber*, 188 F3d 38, 49 (2nd Cir. 1999) (loss of trade secrets cannot be measured in money damages).

Irreparable harm is also presumed since Defendants engage in acts or practices prohibited by a statute that provides for injunctive relief—namely the CFAA. For example, "where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F3d 814, 827 (9th Cir. 2001); *Gresham v. Windrush Partners, Ltd.*, 730 F2d 1417, 1423 (11th Cir. 1984) ("irreparable injury may be presumed from the fact of discrimination and violation of fair housing statutes").

Additionally, irreparable harm exists based on a reasonable likelihood of injury to actual and prospective good will. Damage to Geller's goodwill would be difficult to calculate, thus supporting a finding of irreparable injury. *Rent-A-Center, Inc. v. Canyon Television & Appliance*, 944 F2d 597, 603 (9th Cir. 1991); *Basicomputer Corp. v. Scott*, 973 F2d 507, 512

---

protection under California law. *Courtesy Temporary Service v. Camacho*, 222 Cal.App.3d 1278, 1289 (1990). In *Courtesy*, the Court held that use of customer lists and knowledge constituted a breach of trust and misappropriation of confidential information. There was "substantial evidence to support the trial court's determination that plaintiff's knowledge was confidential and deserving of protection, and that defendants' ability to solicit both more selectively and more effectively was due to their extensive use of plaintiff's customers list – a patent act of unfair competition" (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal.App.3d 458, 466 (1978).) Indeed, cases routinely hold that a former employee's or agent's use of confidential information obtained from his former employer or principal to compete with him and to solicit the business of his former principals' customers is regarded as unfair competition. *See, e.g., Greenly v. Cooper*, 77 Cal.App.3d 382, 391-392 (1978).

13

(6th Cir. 1992). Irreparable harm also exists since Defendant's wrongfully deprives plaintiff of a unique product or contract right that would allow plaintiff to expand its business; e.g., by attracting customers who would purchase other goods, or by creating an opportunity for plaintiff's overall business to expand. *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F3d 27, 37 (2nd Cir. 1995) (breach of licensing agreement for publishing rights for "Mighty Morphin Power Rangers" deprived plaintiff of opportunity to expand its publishing business with other authors and distributors; harm not quantifiable in damages). In this case, Mohawk supplies a specialty pork product to a Japanese wholesaler who had been a customer of Geller. This product opens doors to obtaining new customers and business opportunities.

The customers at issue are longstanding customers of Plaintiff – not clients located by the Defendants on their own. Defendants' retention and failure to return information about sales history, contacts, freight preferences and credit demonstrates that it is not easily obtainable and, for that reason, is valuable in the hand's of a competitor. The Court is entitled and arguably compelled to infer solicitation and use of confidential information under these facts.

### B. The Requested Injunction Will Result In Minimal Interim Harm To Defendants

In view of the narrowly tailored relief Geller seeks, the harm to Defendants would be minimal. Defendants are not likely to suffer any appreciable harm if the injunction is granted as requested to preserve the status quo. Nothing prevents Defendants from competing *fairly*. Plaintiff seeks an order preventing Defendants from soliciting customers of Plaintiff, unless Defendant can prove to the court's satisfaction that Defendant, prior to 2003, sold produce, meats or sea foods to that entity in substantial amounts. Such an order would prevent Defendant from misappropriating Plaintiff's valuable customer information.

### CONCLUSION

Even without the benefit of formal discovery, there is strong evidence that Defendants have misappropriated Plaintiff's confidential customer and supplier information – and are using that information to establish a competing business. As shown above, unless the Court imposes a preliminary injunction as requested, Plaintiff's business will be irreparably harmed by the misuse

of its own information. Plaintiff therefore urges the Court to issue a preliminary injunction on the same terms as the TRO.

Respectfully Submitted,

Dated: October 30, 2007

FUTTERMAN & DUPREE LLP

        /s/
DANIEL A. CROLEY (154386)
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
dan@dfdlaw.com

*Attorneys for Plaintiff*
GELLER INTERNATIONAL, INC,