DILLINGHAM & MURPHY, LLP
CARLA J. HARTLEY (SBN 117213)
BARBARA L. HARRIS CHIANG (SBN 206892)
225 Bush Street, 6th Floor
San Francisco, California 94104-4207
Telephone:   (415) 397-2700
Facsimile:    (415) 397-3300

Attorneys for Defendants and Counterclaimants
HITOSHI NISHIKAWA and ASIA INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| GELLER INTERNATIONAL, INC.,<br><br>       Plaintiff,<br><br>v.<br><br>HITOSHI NISHIKAWA, and ASIA INTERNATIONAL, INC.,<br><br>       Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. C-075159 MMC<br><br>**DECLARATION OF HITOSHI NISHIKAWA IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**<br><br>Date: November 14, 2007<br>Time: 9:00 a.m.<br>Complaint filed: October 9, 2007 |

    1.     I am a named defendant in this action and the president of defendant Asia International, Inc. ("Asia International"). I make this declaration in opposition to plaintiff Geller International, Inc.'s ("Geller International") application for a preliminary injunction. If called as a witness, I could and would testify to the matters set forth in this declaration based on my personal knowledge.

    2.     I was born in Japan in 1953. I lived in Japan until moving to the United States in 1975.

    3.     I have been in the food export business for over 25 years. Prior to joining Geller International, I worked for Oritz Corporation for 20 years as the import/export manager and was

Page 1 –  C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Application for Preliminary Injunction

primarily responsible for developing and finding business for Asian customers. I was also responsible for Wagyu beef import from Japan and its sales in US.

4. I began working for Geller International in April 2003. A true and correct copy of the Employment Agreement I signed is attached as Exhibit A.

5. When I began working for Geller, I contacted many of my contacts from before Geller to try to develop business. A number of my former customers became customers of Geller.

6. When I first began working for Geller, the importation of Wagyu beef from Japan to the United States was banned. However, in approximately March 2005, this ban was lifted. I learned from a contact at Zennoh that Zennoh had nominated Poseidon Seafood in Los Angeles as an importer of Wagyu beef to the United States. Zennoh is a farmers' cooperative in Japan. I have done business with Zennoh for 20 years. When I worked for Oritz, I sold Wagyu imported from Japan through Zennoh, USA, a subsidiary of Zennoh Tokyo. At that time, Zennoh was the only importer of Japanese Wagyu to the United States. I sold the Zennoh Wagyu to restaurants I located using the same or similar methods to those I used while working for Geller.

7. In approximately March 2005, Zennoh invited me to a demo or food show with Poseidon in Los Angeles. The demo was attended by approximately 40 to 50 prospective buyers of Wagyu. Zennoh recommends to Poseidon who Poseidon should sell Wagyu to. Poseidon began selling Wagyu to Geller based on Zennoh's recommendation and because of my twenty year relationship with Zennoh.

8. Before I began working for Geller, Geller was not doing any business with restaurants and was not selling Wagyu. I developed this business by locating high end restaurants, largely through internet sites such as Opentable.com, Gayout.com, and sites that list the top restaurants in the country. I then called the restaurants and tried to sell them Wagyu beef.

9. I developed the business with Prime One Twelve in Florida. A contact in New York told me that he had a customer interested in Wagyu beef and he gave me the telephone number of the chef at Prime One Twelve, Mike Sabin. I looked Prime One Twelve up on the Internet to get some background information about the type of meat they serve at the restaurant.

10. I also brought in business from Masa in New York. I obtained the restaurant's name off an Internet list of the top restaurants in the country, called the restaurant and spoke to the chef and he agreed to purchase Wagyu through Geller. I obtained the name of Rangetsu, a restaurant in Orlando, Florida, from the Internet, called and talked to the owner. The owner agreed to buy Wagyu beef through Geller. I located Allen Brothers and Azul on the Internet. The chef at Grass restaurant is friend of Azul and Azul referred me to Grass restaurant.

11. Developing the business with restaurants purchasing Wagyu took little time or expense.

12. A given customer's order history has little value. There are only a handful of Wagyu cuts available and virtually all restaurants purchase either New York steaks, filets, or rib eyes. The price is largely set by the cost (which is largely determined in Japan) and generally only varies depending on the quantity of an order.

13. Before I left Geller, to the best of my knowledge, no one at Geller had any contact with Poseidon except me, other than when there were issues with Geller paying Poseidon's bills.

14. For people who work in the business of selling specialized and/or imported food products, information on sources of these products is easily obtained through the network of people who work in the business. While there are only a limited number of companies importing Wagyu to the United States, their identities are known to people in my business. I am currently aware of three other companies besides Poseidon that import Wagyu to the United States. One is located just down the street from Geller. One has recently also been appointed by Zennoh and is advertising on the Internet.

15. During my employment with Geller, Jim Geller never told me he considered Poseidon's identity confidential or proprietary or a trade secret of Geller International. Mr. Geller also never told me he considered the identity of the restaurants purchasing Wagyu confidential or trade secrets. He never instructed me not to discuss this information with anyone else or to take any steps to make sure this information was kept confidential.

16. In late August 2007, I approached Jim Geller and told him I was unhappy at Geller International. I believed Geller International improperly calculated and paid my commissions

from 2003 through 2006.  Mr. Geller told me he was sorry I felt that way and said he would see if he could come up with a better proposal.  He mentioned the possibility of a partnership.  I told him if we could not work something out that I was going to go out on my own and start my own company on October 1, 2007.  He told me he would get back to me.

17.  When I did not hear back from Jim Geller, I approached him again on September 5, 2007, and asked him what his thoughts were on the partnership proposal.  I believe he said he was thinking that I would get about 20% to 30% in the business.  I told him I wanted more than 50% of the business because I was the one who had developed the business at Geller International and was generating the majority of business. Geller told me to pack up my stuff and leave and not come back.

18.  During this conversation, Geller initially told me to leave my computer.  I told him that since Geller was keeping the refrigerator that we jointly purchased for the company (at a cost of over $2,000), I would keep the computer.  I understood that the arrangement was acceptable to Geller because he did not say anything to the contrary.  My desk was located in the same room as Jim Geller's desk.  When I packed up my belongings as instructed, including the laptop, he did not say anything further to me.

19.  Geller International provided me with a laptop during the time that I was working for the company.  The first laptop was a Toshiba which was provided with Windows '98 installed, but without any data on it.  That computer crashed in approximately September 2005.  I selected and purchased a Sony to replace it (and was reimbursed by the company) with Windows XP installed on it.  The Sony crashed in April 2007.  I purchased a recovery disk and used that to try to get the computer running again, but ultimately ended up replacing the hard drive.  I loaded Windows XP after installing the new hard drive and then downloaded a Japanese language version of Windows from the Internet.

20.  Geller had three other computers in the office, however, they were not connected in any way.  The only way to transfer information from one computer to another was by email.

21.  To the best of my recollection, at the time Jim Geller fired me, the only data on my laptop were emails, a list of Wagyu customers I prepared for Jim Geller and myself, spreadsheets I

Page 4 –  C-075159 MMC
Declaration Of Hitoshi Nishikawa In Opp. To Application for Preliminary Injunction

had begun preparing in 2006 to track commissions and forms for "thank you" notes to customers. There was no data on the computer that had been provided by the company.

22. At the time I was terminated, my personal digital camera also had photographs of tuna which were taken while I was employed at Geller stored on it. I subsequently deleted these pictures to make room in the camera's memory. To the best of my recollection, the items described in paragraph 21 and this paragraph are the only items related to Geller I have had in my possession stored electronically since leaving Geller.

23. To the best of my recollection, since leaving Geller, the only documents I have had in my possession from Geller were copies of the commission spread sheets I prepared, commission sheets provided to me by Geller, and FedEx charges. I also have my personal Rolodex which I had before working for Geller. The Rolodex has cards for contacts I made while working at Geller.

24. I began preparing the commission spread sheets in 2006 because I did not believe I was being paid all of the compensation I earned. The spreadsheets included invoice dates, numbers, item description, price, customer name and total invoice price. No one at the company directed me to prepare the spreadsheets. I showed the spreadsheets to Geller in or about June 2007. I did not give him a copy and he never asked for a copy.

25. To my knowledge Geller International did not have any customer list when I started working there. The first time I am aware that customers were written down was approximately three (3) months ago when Jim Geller and I wrote down a list of Wagyu customers in order to allow us to cover customers if one of us was out of the office. Customer names were written down but restricted to Wagyu beef only. We decided to do this after a customer called the office while Geller was out and we were unable to follow up. At no time did Geller ever tell me this information or any information was confidential or ask me to keep it confidential.

26. On or about September 8 or 9, 2007 (before Geller requested that the computer be returned) while I was trying to back up the data, the computer again crashed. I used the same recovery disk I used in April 2007 to restart and reinstall Windows XP. I also installed Windows

1  Office. I was not able to download the Japanese version of Windows from the Internet this time.
2  After the computer crashed I was not able to access any of the data that had previously existed.

3      27. On or about September 10, 2007, I downloaded pictures of Wagyu beef from my
4  camera to the laptop and copied those pictures to a CD. The Wagyu pictures were taken after my
5  employment with Geller was terminated. The Wagyu pictures are still stored in my camera's
6  memory.

7      28. I left for a business trip to Hawaii on or about September 10, 2007, at 9:00 a.m. A
8  true and correct copy of my United mileage summary reflecting the dates I flew to and returned
9  from Hawaii is attached hereto as Exhibit B. While I was gone, Geller International sent a letter to
10  me via FedEx demanding the return of the computer. I returned from Hawaii on Saturday,
11  September 15, 2007 at approximately 8:30 p.m. and saw the letter for the first time. I returned the
12  computer to Geller International the next business day, Monday, September 17, 2007.

13      29. Before returning the computer to Geller, I deleted emails related to my new business.
14  To the best of my recollection, I did not delete anything else from the computer.

15      30. I have given my attorneys the external drive that I was using to attempt to back up the
16  data. After the laptop crashed, I looked at the drive and it did not appear that any data had been
17  transferred from the laptop to the drive.

18      31. Other than the external drive and my camera, I never attached any other data storage
19  or transfer devices to the laptop. Other than my efforts to back up to the external drive and CD I
20  made of the Wagyu pictures, I did not transfer or attempt to transfer any other data off the laptop.

21      32. I use wireless Internet at my home, including for the laptop, and my three sons use the
22  same router for their computers.

23      33. On or about September 25, 2007, I incorporated Asia International, Inc. I did not do
24  any business on behalf of myself or Asia International or take any steps to begin setting up my
25  own business until after Jim Geller terminated my employment on September 5, 2007. In forming
26  Asia International, I did not use or employ any documents, material, equipment, or other property
27  of Geller International.
28

34. When Geller International terminated my employment on September 5, 2007, I had been negotiating an order for 20,000 pound plus scallops between a distributor, Northern Wind, and a purchaser. I had brief contact with those parties after my employment was terminated, but did not have any involvement with them after September 12 or 13, 2007. Neither I nor Asia International were a party to this sale, have been paid or received any compensation from the sale, nor will receive any compensation from the sale in the future. I have not had any contact with Northern Wind or the buyer involved in the scallop sale since September 12 or 13, 2007.

35. After I was terminated by Geller, I called Mr. Sabin at Prime One Twelve several times. Since leaving Geller, Prime One Twelve has never placed an order with me and I have not received any compensation from Prime One Twelve. I have not called any of the other Wagyu customers that were developed while I worked for Geller.

36. On or about September 27, 2007, a Japanese customer I did business with before Geller contacted me to place an order for pork belly. I was the one who worked with Mohawk Packing to develop this pork product. I attempted to place the order with Mohawk as requested by the customer, however, Mohawk refused to accept the order. Neither I nor Asia International received any compensation for this order.

37. On or about September 26, 2007, I sent a letter announcing my new business to approximately 12 companies (Whole Sun, Campton Place, Meadowood, Mohawk, Michael Mina, Prime 112, Rangetsu, Grass Restaurant, Azul, Sierra Meat (Reno), Sierra Meat (Santa Clara), and United Meat). A true and correct copy of the letter is attached as Exhibit C. I have not had any contact with the companies since sending the letter and have not received any compensation from them. Other than described in paragraphs 34 through 37, I have had no contact with any customers who did business with Geller.

38. I have spoken to Poseidon Seafood since leaving Geller, both about selling Wagyu to Asia International and also about selling blue fin tuna. Poseidon never sold any blue fin tuna to Geller. Poseidon has contacted me on a number of occasions, indicated that they want to do business with Asia International, and that they view this as expanding their business. I have not placed any orders with Poseidon since leaving Geller. I have not initiated any contact with

1  Poseidon since October 26, 2007, but Poseidon has contacted me several times to express an
2  interest in continuing to do business with me.  Other than Poseidon, Mohawk, and Northern Wind,
3  I have not had any contact with any suppliers who did business with Geller.
4      39.   The proposed preliminary injunction would cause extensive prejudice to my business
5  and customers, and would without any justification unreasonably invade my privacy and the
6  privacy and customers of Asia International.  The request that Asia International and I be enjoined
7  precludes us from serving our clients on a daily basis.  The preliminary injunction would also
8  cause irreparable harm to me and my family.  I have three sons to support and a preliminary
9  injunction would make it virtually impossible for me to make a living in the business I have been
10 working in for over 25 years.
11     40.   I am informed and believe that Geller has informed my preexisting contacts that I am
12 precluded from doing business with them.  A business contact from before my employment with
13 Geller advised me that Geller told them they could not do business with me because my contract
14 with Geller International prohibited it.  I am unaware of any contract provision that prohibits
15 customers from contacting me.
16     I declare under penalty of perjury under the laws of the United States of America and the
17 State of California that the foregoing is true and correct.  Dated this 6th day of November, 2007, at
18 Pacifica, California.

                                                  /s/
                                       Hitoshi Nishikawa

    I hereby attest that I have on file all holograph signatures for any signatures indicated by "conformed" signature (/s/) within this efiled document.

                                                  /s/
                                       Barbara L. Harris Chiang