DANIEL A. CROLEY (154386)
FUTTERMAN & DUPREE LLP
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
dan@dfdlaw.com

*Attorneys for Plaintiff
Geller International, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GELLER INTERNATIONAL, INC.<br><br>Plaintiff,<br><br>v.<br><br>HITOSHI NISHIKAWA and ASIA INTERNATIONAL, INC.<br><br>Defendants. | Case No. C 07-05159 MMC<br><br>**REPLY DECLARATION OF JAMES GELLER IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>**(Civil L.R. 7-10; 65-1)**<br><br>Date: November 14, 2007<br>Time: 9:00 a.m.<br>Complaint Filed: October 9, 2007 |

I, James Geller, declare:

1. I am the President and founder of Geller International, Inc. ("GI"). Based on my role with GI, I have personal knowledge of the facts set forth below and, if called as a witness, could testify competently to them.

2. I have read Declaration of Hitoshi Nishikawa In Opposition to Plaintiff's Application For A Preliminary Injunction. This declaration contains a number of misleading statements, among them being those addressed below.

3. Mr. Nishikawa claims that he developed the Wagyu beef business for GI. This is simply not true. The true facts are that at the time Nishikawa joined GI, there was no Waygu

1 beef business in the United States of America, due to the United States Department of Agriculture's ("USDA") ban on beef imports. The USDA prohibited Japan from exporting its beef into the United States of America from September 2001 until about March 2005, citing bovine spongiform encephalopathy ("BSE") which is commonly called Mad Cow Disease.

4. When this ban on beef imports was lifted in 2005 – two years after Nishikawa began working for GI – Nishikawa and I *together* began to develop business for Wagyu beef.

5. Concerning GI's buyers of Wagyu beef, they consist of three distributors and about 31 restaurants. I personally developed the relationship with all of the distributors and about 29 of the 31 restaurants. GI developed through Nishikawa only 2 of the 31 restaurants, one of which placed only two orders and is not an active customer at this time.

6. Moreover, none of these contacts would have turned into actual customers without the logistical experience and support GI already had in place. Importing and exporting food items is a complex business that requires many components, including refrigerated shipping and refrigerated storage.

7. GI also has a history of dealing with the Zennoh cooperative in Japan, which is one of the few exporters of Wagyu beef. Before GI handled Wagyu, GI did business with Zennoh, including exportation of beef from the United States of America, and assisting Zennoh in returning United States beef at the outset of the 2003 BSE outbreak.

8. Zennoh exports their products into the United States through a clearance agent named Poseidon, which is located in the Los Angeles area. Poseidon became Zennoh's exclusive United States importer and clearance agent in 2005.

9. One of the principal reasons GI was able to develop the Waygu business is because GI aided Zennoh in re-exporting of beef from the United States of America when Japan in late 2003 banned such imports based on an outbreak of BSE in the United States of America.

10. Specifically and before the ban became effective, Zennoh had shipments of beef en route from the United States of America to Japan. GI arranged to have shipments of beef re-imported to the United States of America and re-sold, so that Zennoh would not lose money for the entire shipment. GI's efforts to help this customer earned goodwill for GI and ensured the

company's reputation as a reliable, fair and responsible company. Due to GI's goodwill with Zennoh, Zennoh asked Poseidon if they would initiate an interest in working with GI once the ban on Waygu beef imports had been lifted. Needless to say, Nishikawa had little do to with any of this, except to have some conversations in Japanese and the role any commissioned sales agent would play in dealing with a house account or supplier once the relationship was established and operating.

11. In 2005, Nishikawa and I met with Poseidon representatives at GI's offices. At that meeting, Poseidon representatives said GI was given this opportunity because of my experience in dealing with professional chefs all over Asia and ability to develop the United States market for imported beef from Japan which the Japanese government barred from being exported at the outset the BSE. This opportunity was presented to GI, not Mr. Nishikawa. I am not saying that Mr. Nishikawa played no role, but he did so as a commissioned sales contractor working with GI. The primary factor in GI winning this opportunity was GI's prior relationship with Zennoh and GI's ability to work with chefs and that we have the infrastructure, experience and relationships needed to service the business.

12. The critical problem with the Wagyu beef business is that there is very, very little export supply worldwide. Wagyu is a specialty product that is produced by only a few USDA-approved plants in Japan. Due to its scarcity and its highly-prized flavor and texture, it retails for more than $70 per pound in the United States of America.

13. GI's three distributor customers purchase a good amount of GI's Wagyu product that GI can obtain. The balance is direct restaurant sales.

14. If Nishikawa is allowed to develop business relationships with GI's Wagyu supplier and distributors, and direct restaurants the amount of sales GI will be able to secure will be drastically reduced. Because there is only a limited supply of Wagyu beef, every order Nishikawa takes from one of GI's customers, means that is one less order available for GI to fill.

15. Aside from the identities of GI's customers, I believe Nishikawa has told GI customers, whom he only did business with after joining GI, that he offers same terms, pricing, and supplier for Wagyu beef as GI does.

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct.
3  Signed this 13th day of November, 2007 at Burlingame, California.

                                                /s/
                                          James Geller

8  I hereby attest that I have on file all holograph signatures for any signatures indicated by
9  a "conformed" signature (/s/) within this efiled document.

                                                /s/
                                          Daniel A. Croley